FIRCH BAKING COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 716, 717, Dockets 72–2187, 72–2317.

United States Court of Appeals,
Second Circuit.

Argued May 8, 1973.

Decided May 29, 1973.

---

Wendell Davis, Jr., New York City (McConnell, Scheuermann and Davis, New York City, on the brief), for petitioner.

Stanley J. Brown, Atty., NLRB, Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Acting Asst. Gen. Counsel, and William F. Wachter, Atty., Washington, D. C., on the brief), for respondent.

Before SMITH, MULLIGAN and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

The essential issue presented by the Company's petition to review, and the cross-petition by the National Labor Relations Board to enforce, an order of the Board, 199 N.L.R.B. No. 62 (1972), is whether there was substantial evidence to support the Board's conclusion that the Company violated Section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1) (1970), by unilaterally instituting changes in wages and other conditions of employment without adequate bargaining with the Union. We hold that there was substantial evidence to support the Board's conclusion. We deny the Company's petition to review and we enforce the Board's order.

I.

A three-year collective bargaining agreement between Firch Baking Company of Jamestown, Inc. (the Company) and Local 15520, International Union of District 50, Allied and Technical Workers (the Union) by its terms would have been automatically renewed on January 1, 1972 unless timely notice of termination or desire to modify was given by either party. Such notice was given by the Union in October 1971. Negotiations for a new contract followed. Ten collective bargaining sessions were held, six

before and four after the contract expired on January 1, 1972.

In view of the essential issue presented by the petitions before us, we focus upon the critical events of the five day period—December 27–31—immediately preceding the expiration of the contract. Prior to December 27, negotiations had bogged down, chiefly over the Union's proposal that at least some of the negotiations take place "on-the-clock" (during working hours), a proposal which the Company flatly rejected.

On December 27, the Company delivered to the employee members of the Union bargaining committee a letter enclosing a summary of the Company's "fair, firm offer", including increases in wages, changed pension benefits, changed health coverage and improved major medical benefits. This "offer" was in outline form, not in the form of proposed contractual provisions. On the same day, all bargaining unit employees received a copy of the Company's offer. The Union's chief negotiator received a copy of the offer two days later, on December 29, whereupon he immediately wired the Company that the Union was "willing and ready to meet immediately on mutually agreed time."

On December 30, the Company distributed to all bargaining unit employees another letter advising that if the Union did not accept the Company's "fair, firm offer" by the time the contract expired, the Company would have no alternative but to make the offer directly to the employees in the hope they would accept it and continue on the job. On the same day, at a bargaining session arranged by a federal mediator, the Company's offer was discussed item by item. With the exception of agreement on two non-economic proposals, the Company's offer was rejected by the Union in its entirety. A further bargaining session was scheduled for the following day, December 31, at 6 P.M.

At the New Year's Eve bargaining session, the Company for the first time presented to the Union a document elaborating on and setting forth in contract form the Company's "fair, firm offer". Before the meeting was concluded at 11:45 P.M., the Company's offer had been fully discussed and agreement had been reached on a number of economic as well as non-economic provisions. Since agreement had not been reached on the basic contract itself, however, the Union's chief negotiator announced that he intended to have a federal mediator present at the next bargaining session.

Upon expiration of the existing contract at midnight on January 1, 1972, the Company immediately put into effect all provisions of its "fair, firm offer", including wage increases and other economic benefits. On January 4, the Company announced to its employees that "our unilateral offer to all of you has been in effect since 12:01 a. m. Sunday, January 2. This pay increase will be in the pay check you will receive next week."

During January and after expiration of the contract, four additional bargaining sessions were held, with the employees remaining on the job. At the final session on January 26, the Union agreed to submit the Company's entire contract package, as modified during negotiations, to the employees to determine whether it was acceptable. The employees on February 1 voted to accept the Company's offer as submitted. On February 16, a new contract was signed covering the period through December 31, 1974.

Going back for a moment, on December 29, after the Union received a copy of the Company's first letter to its employees enclosing a copy of the Company's "fair, firm offer" and with the Union and Company still unable to agree upon the hours that negotiations should take place, the Union filed unfair labor practice charges against the Company, alleging that the Company had violated Section 8(a)(5) and (1) of the Act by refusing to meet at reasonable times for bargaining purposes and by attempting to by-pass the Union and deal directly with its employees. A complaint was issued on February 16, 1972, the same

day the new contract was signed, limited to the charge based on the Company's conduct in instituting changes in wages and other conditions of employment during the pendency of collective bargaining negotiations. The Union continued to press this charge.

Following a hearing before a trial examiner on March 27 and 28 at Jamestown, New York, the examiner on June 2 filed his decision which in effect upheld the Union's position. His recommended order, adopted by the Board on September 29, required the Company to cease and desist from unilaterally instituting changes in wages and other conditions of employment without adequate bargaining with the Union, and required the Company to take certain affirmative action, including the posting of notices, to remedy the violations.

## II.

■ After nearly four decades of life under the National Labor Relations Act, few obligations are more firmly established than that of an employer pursuant to Section 8(a)(5) to bargain collectively with a union representing its employees, including its duty not to alter terms and conditions of employment without first giving notice to and conferring in good faith with the union. NLRB v. Katz, 369 U.S. 736, 742–43 (1962). "Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy." *Id*. at 747. And we have held that such unilateral action "at the end of the contract period" operates at a particularly sensitive point of labor-management relations, for "the Union's ability to function as a bargaining representative is seriously impaired. Indeed, such conduct amounts to a declaration on the part of the Company that not only the Union, but the process of collective bargaining itself may be dispensed with." NLRB v. General Electric Co., 418 F.2d

736, 748 (2 Cir. 1969), cert. denied, 397 U.S. 965 (1970).

■ Viewed against these settled principles, the Company's conduct here in unilaterally instituting changes in wages and other conditions of employment during the pendency of collective bargaining negotiations, without affording an opportunity for good faith bargaining and agreement on its package offer, strikes us as a clear refusal to negotiate about affected conditions of employment under negotiation.

■ From the standpoint of timing alone, the extreme haste with which the Company put into effect its changes in wages and other conditions of employment is thoroughly convincing of bad faith in the negotiations, of disparagement of the union and of obstruction of the congressionally mandated duty to bargain collectively. The formal contract proposals of the Company's so-called "fair, firm offer." were not presented to the Union until the evening of December 31, a few hours before the existing contract was due to expire and hardly a day before the Company put the proposals into effect. Even the preliminary summary of these proposals had been disclosed to the employee members of the Union bargaining committee and to all bargaining unit employees only four days before the formal contract proposals were submitted; and the Union's chief negotiator learned about them two days later. The Company's unilateral action in putting the proposals into effect came after only two bargaining sessions were held following preliminary announcement of the proposals.

The nature of the Company's proposals was such as to demand adequate time for study and discussion—item by item, not the entire program as a package. They involved wage increases for various categories of employees, entirely new pension benefits, changed health and life insurance plans and other changes in benefits. The form of retirement plan referred to in the Company's preliminary summary was not furnished to the

Union until the December 31 meeting. The Company never provided the Union with a copy of its proposed insurance plan—showing details of its new medical, surgical and term life insurance coverage—before it became effective.

Finally, if anything further were needed to dispel any vestige of good faith bargaining intent on the part of the Company in making its "fair, firm offer", that was surely provided by the manner in which the Company communicated the offer to its employees. All else aside, the Company's letter of December 30 to its employees, advising them "[i]n the event that the union does not accept our fair, firm offer by the time the contract expires, we have no alternative but to make our fair, firm offer to you directly", surely placed the Company in the position, as we observed in another case, of "having created a view of the bargaining process that admitted of no compromise, [and of being] trapped by its own creation". NLRB v. General Electric Co., *supra*, 418 F.2d at 760. "The aim, in a word, was to deal with the Union through the employees, rather than with the employees through the Union." *Id.* at 759.

Our careful examination of the record as a whole leaves us with the firm conviction that the Company became so enamored with its "fair, firm offer" technique that it ignored its basic duty of allowing adequate time and opportunity for reasonable discussion of the essential details of its offer. The Board, in its decision affirming the trial examiner in the instant case, stated:

"Quite apart from [the Company's] argument that N.L.R.B. v. General Electric Company, 418 F.2d 736 (C.A. 2), sanctions its 'fair, firm offer' bargaining strategy, which argument we do not pass upon here, [the Company's] December 30 letter to the employees makes it clear that the 'fair, firm offer' was not so much an offer as it was a promise to [the Company's] employees that a specified wage increase would be granted. In-asmuch as the employees were promised the wage increase irrespective of its acceptance or rejection by the Union, before the increase had even been presented to the Union, therefore the wage increase was in fact a firm decision which removed the element of bargaining, and *a fortiori*, no good-faith bargaining impasse had resulted when the [Company] effectuated its 'fair, firm offer.'"

We agree. And despite the elaborate arguments which have been pressed upon us as to whether a company may unilaterally institute changes in wages and other conditions of employment without bargaining to impasse with the union about such changes, in our view this is not an "impasse case" at all. It more aptly might be called a "poisoned fountain case": the fountain was poisoned before it ever began to flow.

Petition to review denied; enforcement granted.