**In re UNIT PARTS COMPANY, Debtor.**

**Bankruptcy No. 80–01101.**

United States Bankruptcy Court, W. D. Oklahoma.

May 12, 1981.

As Corrected May 18, 1981.

---

**78.** *See* Restatement of Security, § 8.

**79.** *Maine League Federal Credit Union v. Atlantic Motors,* Me., 250 A.2d 497, 500 (1969).

**80.** *See id.*

Murray Cohen, Oklahoma City, Okl., trustee and attorney for trustee.

John Hermes and Louis J. Price, Oklahoma City, Okl., for The Bank of America, appearing intermittently.

G. Blaine Schwabe, III, Oklahoma City, Okl., for Borg-Warner Corporation and Borg-Warner Leasing Division of Borg-Warner Acceptance Company, appearing intermittently.

Sara M. Green, Washington, D. C., for National Labor Relations Board.

Kathleen Aure, Fort Worth, Tex., for Region 16, National Labor Relations Board.

Eugene H. Mathews, Oklahoma City, Okl., for Local No. 644, United Food and Commercial Workers AFL–CIO.

Robert E. Funk, Jr., Washington, D. C., for United Food and Commercial Workers International Union and International Food and Commercial Workers International Union District Local No. 644.

John Preefer, New York City, for United Food and Commercial Workers International Union AFL–CIO/CLC District Local 644.

## MEMORANDUM OPINION

ROBERT L. BERRY, Bankruptcy Judge.

### Statement of the Case

On December 15, 1980, the National Labor Relations Board (NLRB) filed its first amended Proof of Claim in the debtor estate. The claim is based on alleged multiple violations of 29 U.S.C. § 151 et seq., known as the National Labor Relations Act. This claim was filed as a "priority claim believed to be in excess of $345,000.00." In its brief filed after the conclusion of testimony in this matter, the NLRB advised the Court that its claim had accrued to $838,-317.58 as of April 1, 1981.

On January 30, 1981, the Trustee filed an objection to the NLRB's claim. Hearing was held on the Trustee's objection on February 17 and 18, 1981, and March 9 and 10, 1981. After close of the evidence, this Court requested briefs of all parties. United Food and Commercial Workers, District Local 644 (Union) participated throughout the hearing and has also filed a brief.

### Facts

Unit Parts Company, a remanufacturer of automotive parts, was acquired from the Borg-Warner Corporation in 1976. Since then, production and maintenance workers have been represented by various union organizations until November of 1979 when, through a merger, the Meatcutters Union Local 644 assumed the representation of these employees. At that time a collective bargaining agreement was in effect which had an expiration date of May 19, 1980.

About the first of the year 1980, the company began experiencing business difficulties. Sales dropped and the company became hardpressed to make its monthly bank loan payments. Starting in February, as a result of the decreases in sales, the company starting cutting back production and laying off production employees.

In March of 1980, Mr. Joseph Chicoine, Local 644's Secretary-Treasurer, contacted Mr. Edwin Collins, Director of Industrial Relations at Unit Parts, with regard to the impending expiration of the labor contract. From March through June of 1980, Chicoine met with Collins and/or Mr. Dick Swearingen, Plant Manager, some eight or nine times for negotiations.

While these negotiations continued, the company continued production cut backs and worker layoffs until May, when production had for all practical purposes ceased. When it became apparent to the parties that they would not be able to reach a final agreement before the May 19, 1980, expiration date of the old contract, they executed a letter of agreement, dated May 7, 1980, which provided in part:

"That there shall exist between the Company and the Union an extension to its current Labor Agreement of 28 calendar days. Said Agreement must now expire at 12:01 A.M. the 16th day of June, 1980, as opposed to the original expiration date of the 19th day of May, 1980, at 12:01 A.M.

"That any and all economic agreements made during the above stated contract extension shall be made retroactive to the 19th day of May, 1980."

Prior to the expiration of the extension agreement and unbeknownst to the company at the time, an involuntary bankruptcy petition was filed against the company on June 6, 1980, under Chapter 11 of the Bankruptcy Code. On June 10, 1980, the following agreement was signed by Collins and Chicoine:

"(1) The language agreed to is a complete agreement with respect to non economic issues. However, in the event language from the old agreement hasn't been addressed it will be incorporated in the new agreement.

"(2) Trucking language will remain the same as in the agreement dated May 23, 1977 to May 19, 1980.

"(3) Article 23. Grievance Procedure and Arbitration is applicable with respect to contract language.

"(4) In regards to economic issues the agreement will be extended on the day to day basis until the issues are resolved.

The issues to be resolved are Health & Welfare, Pension, Holidays, Vacations, Wages and Cost of Living.

"(5) Article 23. Grievance Procedure and Arbitration and Article 22 No Strike No Lockout is not applicable with respect to economic issues that have not been resolved during the extension. The Local Union reserves the right to strike on economic issues that are not resolved.

"(6) All economic issues will be retroactive back to May 19, 1980.

"(7) The term of agreement shall be from May 19, 1980 to February 20, 1983."

On June 17, 1980, service of the involuntary bankruptcy petition was made on the company. Collins notified Chicoine of this on June 23, 1980.

On June 27, 1980, the company sent a letter to each of its production employees, all of whom had been laid-off, which contained the following:

"Due to the economic inability of Unit Parts Company to continue your employment status, you are hereby terminated effect this date. Your group insurance will remain in effect for the next thirty (30) days."

Copies of these letters were sent to Chicoine.

In his testimony before the National Labor Relations Board (submitted to this Court by agreement), Mr. Edward McQueen, who had been president of Unit Parts until September of 1980, outlined the reasoning behind the action:

"... Basically, again the specific dates, about the end of March or April we effectively stopped production for all practical purposes. We laid off probably 99 per cent of the work force.

"We had some very very serious cash flow problems that were exacerbated by the fact the bank—the Bank of American [sic] had a—we had a flow through account—a [sic] account that was set up that they monitored, and they started capturing the money as it went into the bank account.

"As it turned out, in fact, they caused some checks to be bounced when we had money in the account because they decided to take the money out of the account. So, we had lost control of our cash flow. We had a huge work force that was laid off. No certainty that we could manage our cash flow.

"We tried to as drastically and severely as we could really to try and cutback any kind of asset expenditure. Any kind of extra expenditure even necessary expenditure to conserve what little cash flow we had....

\*　　\*　　\*　　\*　　\*　　\*

"The company was basically shut down. We were struggling like crazy trying to figure out how to keep some flow going. We were in bad trouble.

\*　　\*　　\*　　\*　　\*　　\*

"... [The employees] were terminated really on advice of our counsel....

"... We were trapped with a large work force that was laid off. The bank had control of the cash, and if we continued the work force in layoff we couldn't pay the insurance benefits going forward.

"If we terminated them we couldn't pay the severance cost at termination. We didn't know with two bad solutions what authority we had with the bankruptcy petition filed, so we went to counsel and said help. Which road do we take, and we terminated the work force. I think it was the 26th. It was a rotten solution either way.

\*　　\*　　\*　　\*　　\*　　\*

"... we paid the termination expense. With the laid off people we paid the termination expense faithfully until we got in under the jurisdiction basically of the court of the bankruptcy, then we could not.

\*　　\*　　\*　　\*　　\*　　\*

"... when somebody would quit, there would be people that were laid off that would quit. They would have vacation and leave benefits that were due them. They were paid until we lost control of that and really had no funds to do it with. That is what I mean by [termination expense]."

On June 20, 1980, Chicoine filed a grievance with Collins regarding these terminations. According to Mr. Arthur Cleveland, who was the company's accountant in June of 1980, the company's bank account was overdrawn approximately $10,000 and on June 27, 1980, when the employees were terminated, the company owed $99,000 in medical insurance premiums which it would not pay.

On July 7, 1980, an order for relief was entered pursuant to the involuntary bankruptcy petition.

As part of the company's effort to reorganize, it was decided that the company would pursue two separate courses of action. First, the number of different products remanufactured and marketed would be reduced from eight to three. Second, the inventory and other assets of the company that were not to be used in connection with the three products continued, would be liquidated and the proceeds turned over to the Bank of America, the company's primary secured creditor.

In pursuance of these two courses of action, at some time during July or August, the company began to recruit employees. Offers of temporary employment were made for the purpose of preparing for the public auction of the no longer needed assets. Offers of full time employment were also made in connection with gradual resumption of limited production of the three continued product lines. The rates of pay offered in both instances were substantially lower than that paid previous to the company's shut down.

This recruitment was done in two ways. First, a seniority list of former employees was used. Certain employees were selected on the basis of their former supervisors' opinion of their skill and without regard to seniority. Once these selections were made, the remainder of the list was used in order of seniority. As needed, former employees were contacted by telephone and the offers of re-employment made. Those that could not be contacted by telephone were sent letters which notified the former employee of the unsuccessful telephonic contact attempt and requested that the former employee contact the company if interested in re-employment. Chicoine was furnished a sample copy of these letters on September 19, 1980. Of approximately 92 former employees initially contacted telephonically, 38 were hired while 54 refused re-employment. Of approximately 264 to which letters were sent, 13 refused re-employment, 4 did not respond to subsequent telephone contact attempts and the remaining 247 did not respond at all to their letters. Approximately 22 could not be contacted either by telephone or by letter.

Also, at some time prior to July 14, 1980, the company contacted the Oklahoma Employment Commission in an effort to recruit other employees. Mr. Jack Vollbrecht testified that this was done due to difficulty in rehiring former employees.

The company has since that time gradually expanded its work force. In October of 1980, the company had approximately 40 hourly employees and in March of 1981, when this hearing was held, there was approximately 120.

### Law

The NLRB first contends that there exists a valid and binding collective bargaining agreement between the Union and Unit Parts Company which is binding on Unit Parts Company, Debtor in Possession, in its capacity as an "alter ego" under the National Labor Relations Act. Accordingly, the Board contends that the Company violated 29 U.S.C. § 158(a)(1) and (5) on and after June 27, 1980, by refusing to abide by the alleged agreement with the Union.

The Trustee on the other hand, asserts that there was no agreement, but only ongoing negotiations which were directed toward an agreement. Therefore, he contends there was no agreement at all subsequent to the termination of the extension on June 16, 1980.

In general, a collective bargaining agreement is an effort to erect a whole system of industrial self-government. Central to its unique purpose is the goal of industrial labor peace, without which each and every dispute is subject to only temporary resolu-

tion dependent on the relative strength of contending forces. *United Steel Workers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

■ It is clear from the evidence that the May 23, 1977, collective bargaining agreement between Unit Parts and the Union was extended by letter agreement on May 7, 1980, for 28 days. Under the terms of this letter agreement the complete terms of the May 17, 1980, agreement were extended to and expired at 12:01 a. m. on June 16, 1980.

During the course of the negotiations that followed for a new collective bargaining agreement and prior to June 10, 1980, Collins and Chicoine discussed a list of written proposals. As the parties approved specific language provisions of the proposals, those provisions were initialed and dated by Collins and Chicoine. The exhibits reflect that these actions took place between May 28, 1980, and June 6, 1980. Among the provisions so approved were Article 22, captioned "No Strike—No Lockout" and Article 23, captioned "Grievance Procedure and Arbitration."

On June 10, 1980, six days prior to the termination of the 1977 collective bargaining agreement, the parties signed a document titled "Memorandum of Agreement". It is interesting to note that this document specifically stated that the previously approved articles 22 and 23 were not applicable as to unresolved "economic issues". This Court finds and concludes that the June 10, 1980, Memorandum did not supercede the letter agreement of May 7, 1980, and did not extend the agreed to termination date of June 10 Memorandum, i. e. "In regard to economic issues the agreement will be extended on a day to day basis until the issues are resolved," was clearly a memorandum made to memorialize progress in the course of ongoing negotiations and not a memorialization of a final collective bargaining agreement. The unabridged 1961 edition of *Webster's Third New International Dictionary* defines the term "day to day" as used in the phrase "day to day basis" as meaning "a day at a time without

provision for continuance thereafter." By its terms, the June 10, 1980, Memorandum contemplates further negotiations in regard to Health and Welfare, Pensions, Holidays, Vacations, Wages and Cost of Living.

This Court does not believe the June 10, 1980, Memorandum to be a final collective bargaining agreement, in fact or in law. A review of applicable cases discloses that the NLRB will not recognize an agreement as sufficient to bar a certification petition unless it contains substantial terms and conditions sufficient to stabilize the bargaining relationship. *Appalachian Shale Products Company*, 121 NLRB 1160; 1958–59 CCH NLRB Sec. 55743; 42 LRRM 1506: "Failure to make such provisions leaves the parties in a continuous state of uncertainty with respect to material and pertinent aspects of their labor relations during the lifetime of the agreement. Consequently, the contract is incapable of providing the stability contemplated by the Act."

In *Spartan Aircraft Co.*, (1952) 98 NLRB 73; 29 LRRM 1295, the Board upheld a contract as a bar in which wage rates had not yet been agreed to. However, holidays, vacations and cost of living had been covered. In *Levi Strauss and Co.*, 218 NLRB 625; 89 LRRM 1402, an agreement was upheld as a bar which was missing wage rates, but contained provisions for insurance, disability, vacations and holidays.

The NLRB cites *Sheetmetal Workers Union*, 54 LRRM 1130, which is inapplicable to the present case on its facts. In *Sheetmetal Workers*, the defendant employer had signed an "interim" agreement which bound it to accept whatever agreement was subsequently negotiated by the Union and a multi-employer association of which the defendant employer was a part. The June 10 Memorandum does not bind Unit Parts to any "subsequent" agreement, nor can it be cast as a new collective bargaining agreement with a provision to "reopen" negotiations on wages, pensions, cost of living, etc. To "reopen" contemplates that terms have been closed as is not the case here.

The Trustee urges that the June 10 Memorandum allowing the Union the right to

strike on economic issues denies the existence of a collective bargaining agreement. Standing alone, the inclusion of this term does not mandate the conclusion that there is not a collective bargaining agreement. *NLRB v. Lion Oil Co.*, 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957). The term is somewhat significant in the instant case, however, in that it serves as a further indication of the lack of agreement between the parties.

In light of the foregoing findings, this Court need not determine issue of Ed Collins' apparent authority to bind Unit Parts to a collective bargaining agreement. There was no new agreement.

The existence or non-existence of a collective bargaining agreement effective until February 20, 1983, is not dispositive of the issue of the debtor in possession's liability for unfair labor practices. The NLRB bases part of its claim upon an alleged violation of 29 U.S.C. §§ 158(a)(3) and (1) arising out of the termination of Unit Parts employees on June 27, 1980.

■ Section 158(a)(3) prohibits employer "discrimination in regard to hire or tenure of employment or by any terms or condition of employment to ... discourage membership in any labor organization." The determinative factor in finding a violation of § 158(a)(3) is the employer's motivation. *American Ship Blg. Co. v. NLRB*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). The test is the employer's true purpose or real motive in hiring or firing. *TCW & H v. NLRB*, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961). A determination of the employer's true motive is a question of fact to be determined from a consideration of all the evidence. *NLRB v. Murray-Ohio Mfg. Co.*, 358 F.2d 948 (6th Cir. 1966). In that regard, a finding must be made that the alleged discriminatory conduct was motivated by an anti-union purpose in order to impose liability under § 158(a)(3). *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1976).

The Trustee urges that the financial condition of Unit Parts forced the termination of all production workers. It is undisputed that since 1964, Unit Parts had been party to successive collective bargaining agreements. The evidence established a historical relation of management-labor harmony. The NLRB did not contend, nor did the evidence reflect, any historical anti-union conduct. The testimony of the NLRB and Trustee's witnesses showed that during the several months preceding the June 27, 1980, termination, the parties had actively pursued negotiations for a new agreement. It was the testimony of Mr. Chicoine, the Union representative, that Unit Parts representatives candidly represented the dismal financial condition of the company. Between the months of February and May, 1980, nearly all of Unit Parts' production workers had been laid off. The Union representative was aware that by May, 1980, production had ceased at the plant. Mr. Chicoine testified that due to the obvious financial problems of the company, the Union was not pressing the company for new economic terms.

It is undisputed that the management of Unit Parts was not aware until June 17, 1980, that an involuntary petition had been filed against the company on June 6. The Union was notified of the involuntary petition on June 23.

By the last week of June, 1980, the company was overdrawn on its bank accounts by $10,000.00. Mr. Art Cleveland, the Unit Parts accountant at the time, testified that at the beginning of June, the company's major secured creditor, the Bank of America, had seized control of the company bank accounts and account receivables. At the end of June, the company had been left without operating funds. The company was $99,000.00 in arrears to its group insurance carrier, with additional premiums due. About 400 Unit Parts employees were notified by mail on June 27, 1980, of their termination. A copy was sent to the Union representative, Mr. Chicoine.

■ The parties are all in agreement that the June 27 termination was a tragedy. However, it was not a violation of § 158(a)(3). Union activity is no bar to discharge where the discharge is for sound business reasons. *Montgomery Ward and*

*Co. v. NLRB*, 377 F.2d 452 (6th Cir. 1967). The NLRB presented no persuasive evidence that this event was precipitated by anti-union animus. This Court finds that the motive of Unit Parts in terminating the production employees on June 27, 1980, was for sound business reasons.

The NLRB also bases a portion of its claim upon an alleged violation of § 158(a)(3) and (1) for discrimination in the hire of former Unit Parts employees by the debtor in possession.

Section 158(a)(3) was designed to allow employees to freely exercise their rights to join unions without imperiling their livelihood. *Radio Officers Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). No direct threats to a union are necessary to establish a violation of § 158(a)(3). *NLRB v. Oklahoma General Drivers*, 235 F.2d 105 (10th Cir. 1956). In order to find a violation of § 158(a)(3), three requirements must be met: (1) the employer must discriminate as to hire or tenure of employment, or any term or condition of employment (2) a resulting discouragement of union membership, and (3) anti-union motive. *E. I. DuPont DeNemours & Co.*, 480 F.2d 1245 (4th Cir. 1973).

Mr. Tom Vollbrecht testified that as production began to resume, the debtor in possession conducted a telephone campaign in order to contact former Unit Parts employees. The substance of these calls was that production was starting and jobs were available. Mr. Vollbrecht testified that when it became apparent that most people could not be reached by telephone, he had letters sent to those not contacted by phone. These letters, dated October 2, 1980, notified former Unit Parts employees of the availability of jobs. Mr. Vollbrecht testified that he used Unit Parts employee lists in his contacts. A copy of the October 2, 1980, letter was sent to the Union representative. This campaign led to the hire of over 30 union members.

The NLRB alleges that hire by the debtor in possession of former Unit Parts employees was conditioned on abstention from Union activities. The testimony of several former Unit Parts employees was to the effect that a Debbie Mapes, a clerical employee of Unit Parts, during the course of telephone conversation, made the statement that the company was "no longer union", and that there would "not be a union in the future". The testimony of Michael King, one of the NLRB's witnesses, was that he was offered a job twice in one day by Mapes. It has not been explained how these job offers reflected an attempt to discriminate against Mr. King's union activities. Indeed Mr. King's testimony was that the offered wage rate of $3.75 per hour was not sufficient for him to support his family. He testified that when Mapes called him back to offer him a temporary position at $6.00 an hour, he could not accept due to conflict with another job.

The record reflects that Debbie Mapes placed calls to former Unit Parts employees to notify them jobs were available. There was no evidence that she was in any type of supervisory capacity, or that she had authority to hire people or set policy. The testimony concerning her alleged statement is at best inclusive.

Isolated statements of employees which are neither authorized nor encouraged by the employer will not be imputed to the employer. *NLRB v. Standard Oil Co.*, 124 F.2d 895 (10th Cir. 1941); *Wilson and Co. v. NLRB*, 120 F.2d 913 (7th Cir. 1941). The NLRB presented no evidence that Mapes had authority or was encouraged to make such statements. In addition, even if taken as true, these statements contain no threat or promise of benefit in regard to union activity. Section 158(a) excepts statements of opinion or argument from the purview of the Act. After weighing the remarks against the testimony of the circumstances in which they were allegedly made, the Court finds them wholly inadequate as § 158(a)(3) violations.

A great deal of the testimony concerned the four meetings between the Union and the debtor in possession during the months following the order for relief. Mr. Chicoine testified that during the July 22 meeting, Mr. Jack Vollbrecht made the statement

that "he saw no need for a union at the time." Mr. Vollbrecht, Sr. testified that at the same July 22, 1980 meeting, a Union representative threatened that unless the debtor cooperated with the Union, it would not survive. Each of the parties credited with these statements has denied they were made. In view of these respective denials, and the surrounding circumstances under which that statements were alleged to have been made, they are at best, evidentially inconclusive. Moreover, any personal opinion which Jack Vollbrecht may have expressed at a bargaining session is irrelevant as to the issue of whether any coercion as to union activity was used with respect to prospective employees since it is not alleged that Vollbrecht expressed such an opinion to the prospective employees themselves.

This Court, after having reviewed the testimony and exhibits presented in connection with the alleged § 158(a)(3) violation, can find no pattern of discrimination based on union activity in the hire of former Unit Parts employees by the debtor in possession. Further, the Court finds that no condition of abstention from union activity, overt or subtle, was imposed upon the debtor in possession's employees or applicants.

The NLRB further alleges that the debtor in possession violated §§ 158(a)(5) and (1) by failing to bargain with the union regarding the conditions under which employees would be hired. Section 158(a)(5) makes it an unfair labor practice for an employer "... to refuse to bargain collectively with the representative of his employees ..." The NLRB reasons that this duty to bargain imposes an obligation upon the employer to make no unilateral changes in employment conditions without first advising the bargaining representative and providing it with an opportunity to bargain concerning the proposed change. *NLRB v. Katz*, 369 U.S. 36, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); see also *NLRB v. R.L. Sweet Lumber Co.*, 515 F.2d 785 (10th Cir. 1975). The NLRB also argues that where conditions of employment are defined by the terms of a collective bargaining agreement which has expired, an

employer remains obligated under § 158(a)(5) to consult with and to negotiate with the union prior to instituting any changes from the terms of the employment established by the previous contract. *Firch Baking Company v. NLRB*, 479 F.2d 732 (2nd Cir. 1973), *cert.* denied, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323; *NLRB v. Sky Wolf Sales*, 470 F.2d 827 (9th Cir. 1972). Finally, the NLRB asserts that an employer violates § 158(a)(5) and (1) by refusing to bargain with the employees' lawful bargaining representative and attempting rather to bargain directly with members of the unit. *Medo Corporation v. NLRB*, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

This Court accepts and understands the NLRB's contention that an employer is not relieved of the duty to bargain by the mere fact of the institution of proceedings in bankruptcy. Indeed, where a bankruptcy court has specifically authorized the rejection of a collective bargaining agreement, the courts have admonished that debtors must continue to comply with their obligations under the Labor Act. *Kevin Steel Products, Inc., supra; Bohack Corp., supra.* The NLRB urges that among these obligations is the duty to bargain with the union prior to instituting unilateral changes in established terms and conditions of employment—an obligation which continues irrespective of the expiration of a predecessor contract or a debtor's release from its obligations under a collective bargaining agreement by order of the bankruptcy court. See *Lewis Canter d/b/a Century Printing Co.*, 242 NLRB No. 108 (1979).

In the instant case, however, the NLRB's reliance is misplaced. This is not a case of an employer's unilaterally changing the terms and conditions of the employment of existing employees. At the time the order for relief was entered on the involuntary bankruptcy petition thereby creating a "debtor in possession" under the bankruptcy code, the company had no production employees. They had all been previously terminated due to economic necessity. Therefore, rather than unilaterally changing the employment conditions of existing employees, the debtor in possession merely

specified the conditions under which it would hire employees.

■ The issue thus presented is whether the debtor in possession was obligated to bargain with the union as to the terms and conditions under which it would hire employees. In *NLRB v. Burns Security Service*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Supreme Court found that a successor employer, not bound by a predecessor's collective bargaining agreement, was not guilty of an unlawful refusal to bargain by specifying hiring terms different from those included in the predecessor's agreement. The obligation to bargain with the union arises when the successor hires so many of the predecessor's employees as to give the union a majority status.

Is the debtor in possession a successor employer? This Court believes it to be so. Upon the entry of an order for relief, a new entity is created with its own rights and obligations. This new entity, the debtor in possession, is simply not the same entity as the prebankruptcy company. Until the debtor in possession assumes an old agreement or makes a new one, it is not a party under § 158(d) to any labor agreement with the Union and is not subject to the termination or modification restrictions of that section. *Kevin Steel, supra.* See also *Brotherhood of Railway, etc. v. REA Express Inc.*, 523 F.2d 164 (2nd Cir. 1975).

The NLRB's contention that the debtor in possession should be treated as the "alter ego" of Unit Parts is without legal or factual merit. The view that the debtor in possession be treated as the same legal entity as the debtor is too simplistic and is contrary to congressional intent. 11 U.S.C. § 1101(1), 1107(a). See S.Rep.No.95–989, 95th Cong., 2nd Sess. 116, Reprinted in [1978] U.S.Code Cong. and Ad.News 5787, at 5902. The application of alter ego implicitly requires a showing of some invidious underlying scheme. The Court finds that this debtor was forced into Chapter 11 because it was insolvent. No evidence has been presented to show a coordinated maneuver between Unit Parts' petitioning creditors and management to rid the company of its union.

As previously stated, the obligation of a successor employer to bargain with a union representing the predecessor's employees begins when the successor hires enough of them to give the union a majority status. In connection with this last point, § 159(a) of the Act requires that the Union represent at least a majority of employees at a bargaining unit before § 158(d) is applicable. The evidence showed that about one-third of the debtor in possession's employees are Union members.

The situation might be different if a majority of the debtor in possession's employees were union members. In that situation the debtor in possession might have been required to bargain with the union before changing the terms of the expired Unit Parts contract. *Overnite Transportation Co.*, 157 NLRB 1185 (1966), enforced *sub nom. Overnite Transportation Co. v. NLRB*, 372 F.2d 765 (4th Cir. 1967). This duty is not present where, as here, the Union does not represent a majority of workers in the unit as required by § 159(a). One of the complaints of the NLRB was that the greater number of employees of the debtor in possession were non-union members. The debtor was under no obligation to hire former Unit Parts employees. It was obligated not to discriminate, and the Court holds it did not. It is significant here that the debtor in possession set its initial terms and wages before it had hired a single new employee.

To impose the terms of an expired collective bargaining agreement on the debtor in possession would violate statutory direction in § 158(d) and § 159(a), as well as ignore the fundamental change of entity on July 7, 1980. Had the NLRB proved a scheme to oust the Union, the result would be different. The NLRB did not prove any plan on the part of Unit Parts management to fire Union members and subsequently hire non-union members. The record showed that it was not until July 25, 1980, that the debtor in possession obtained permission to use the cash collateral of secured creditors, by which it could resume production. Until that order was entered, it was entirely speculative whether the debtor in possession

would survive at all. The Court finds that the only employees hired during the month of July and early August, a total of seven, were those necessary to maintain the estate and prepare for the auction of estate property. These were temporary positions. The testimony of Michael King, a former employee, reflected he was offered one of these jobs and refused same.

The Court finds that as production slowly resumed, the debtor in possession began placing phone calls to former Unit Parts employees, informing them of the availability of work. The Court finds that the debtor in possession was under no obligation to do this, and that it was not required to contact these people through the Union.

The evidence shows that subsequent to the order for relief, Union and debtor representatives met four times. Two of these meetings were prior to the order of July 25, 1980, allowing use of cash collateral. It is apparent from the testimony that these meetings were strained. This was due to the fixed position of both parties about the status of the prior Unit Parts collective bargaining agreement.

■■■ The mere fact that a party adamantly insists on a bargaining position or has not yielded from its position on issues does not render it guilty of a refusal to bargain in good faith. *Wallite Division of United States Gypsum Co. v. NLRB* (SCA, 1973). In this case, until the debtor in possession had assembled a work force in which a majority of the production employees were union members, it had no obligations to assume on prior labor agreements or to bargain with the union on the terms of its hire of employees. *NLRB v. Burns Security Service*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The above considered, the claim of the NLRB based on refusal to bargain with the union is disallowed.

■■■ The NLRB also bases part of its claim upon the termination of pension benefits and group insurance effective June 27, 1980, with the termination of the employees.

The evidence reflected without contradiction that by the end of June, 1980, the Company was in a negative cash flow position. It was $99,000.00 in arrears to the group insurance carrier and had another payment due immediately, which could not be paid. The Court finds it was the inability of Unit Parts to pay this sum that caused the cancellation of the insurance coverage.

The termination of pension benefits was caused by the same economic distress. The Court finds that by June 27, 1980, there was no money to pay pension benefits. The testimony of Mr. Chicoine was that he was aware of the Company's financial condition weeks prior to June 27, 1980.

In *National Terminal Baking Corporation, etc.*, 190 NLRB No. 98; 1971–CCH NLRB Section 23,048, the Board found that an employer did not violate his bargaining duty under § 158(a)(5) by closing his plant without notifying the Union, since bargaining about the closing itself would have been pointless in view of the employer's overwhelming financial need. This testimony in this hearing presents a similar situation. The NLRB did not suggest in its arguments, nor did the evidence suggest, that any purpose would have been served by bargaining over these matters. Bargaining would not have produced the one item needed—money. The NLRB claims based on employees, pension and insurance termination are disallowed.

### Conclusion

In light of the foregoing factual findings and legal authorities, this Court concludes that the actions of Unit Parts Company with regard to termination of its employees did not constitute an unfair labor practice since such actions were taken for sound business reasons due to economic necessity and were not precipitated by any anti-union sentiment. This Court also concludes that the actions taken by the debtor in possession in connection with the gradual establishment of a work force to meet new limited production did not constitute unfair labor practices under the National Labor Relations Act. The claim submitted by the

NLRB based on alleged unfair labor practices is therefore disallowed.

This Court wishes to make clear, however, that the disallowance of the unfair labor practice claim of the NLRB in no way affects any claims for wages, compensation or other benefits earned by any employee or former employee of Unit Parts as covered by the Bankruptcy Code (11 U.S.C. §§ 507(a)(3) & (4)). Such claims and rights thereunder will be timely considered by this Court.

IT IS SO ORDERED.