**MIDSTATE TELEPHONE
CORPORATION,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

Nos. 878, 1041, Dockets 82–4168, 82–4188.

United States Court of Appeals,
Second Circuit.

Argued March 2, 1983.

Decided April 20, 1983.

Victoria A. Higman, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Atty., N.L.R.B., Washington, D.C., of counsel), for respondent.

William C. Moul, Columbus, Ohio (Thompson, Hine & Flory, Columbus, Ohio), for petitioner.

Before FEINBERG, Chief Judge, TIMBERS and CARDAMONE, Circuit Judges.

FEINBERG, Chief Judge:

Midstate Telephone Corporation (the Company) petitions this court for review of the July 26, 1982 order of the National Labor Relations Board (the Board), finding petitioner guilty of certain unfair labor practices. The Board has cross-applied for enforcement of its order. We enforce the order in part, and deny enforcement in part.

In 1979, the Company had three separate collective bargaining agreements covering three bargaining units of the Company's non-professional employees, located in Jamestown, Fulton, and Syracuse, New York. The Company is a public utility supplying telephone service to the public in upstate New York. In February 1979, the Company proposed to the two locals of the International Brotherhood of Electrical Workers, AFL–CIO involved (collectively referred to hereafter as the Union) that a single state-wide collective bargaining agreement be negotiated to replace the three separate agreements, all of which were due to expire on October 31, 1979. After discussing the proposed negotiations with the Union, the Company prepared a draft agreement detailing the procedures to be followed in the joint negotiations. This procedural agreement, which was ratified by the employees in the three units, provided among other things that the employee negotiators would be "reimbursed for expenses incurred in such bargaining on the basis of a per diem rate of twenty dollars ($20.00) for each full day of such bargaining," plus necessary travel and lodging expenses.

The Company paid the expenses of the employee negotiators for the many bargaining sessions held between July and October 31, 1979, when the underlying collective bargaining contracts were due to expire. These contracts were then extended on a day-to-day basis until November 19, 1979, when the employees went out on strike. In April 1980, after a number of further bargaining sessions, the parties agreed on a single collective bargaining agreement, and the striking employees returned to work. The Company refused, however, to reimburse the employee negotiators for expenses incurred while attending the bargaining sessions held during the strike.

In July 1980, eighteen Company employees arrived at work wearing T-shirts emblazoned with a trademark, which was depicted as cracked in three places, and the words "I SURVIVED THE MIDSTATE STRIKE OF 1971–75–79."[1] All eighteen employees were told they could not work until they changed their shirts. Six had other clothing with them; the rest were excused but not paid for the time it took them to procure a change of clothing.

The Union filed unfair labor practice charges with the Board based on the refusal to pay negotiators' expenses and the T-shirt ban. In August 1981, the Administrative Law Judge (ALJ) held that the Company did not violate the National Labor Relations Act by requiring the employees to change their shirts, but found that the Company's failure to reimburse the employee negotiators' per diem, travel, and lodging expenses violated §§ 8(a)(1), (3), (5) of the Act, 29

---

1. The trademark was that of the Company's parent and, for convenience, is hereafter referred to as the Company's.

U.S.C. §§ 158(a)(1), (3), (5). In July 1982, the Board affirmed the decision of the ALJ on the negotiators' expense issue, but reversed on the T-shirt issue, finding that the Company's refusal to allow the T-shirts violated §§ 8(a)(1) and 8(a)(3) of the Act.

### I. The T-Shirt Issue

The Company raises several arguments in support of its claim that it did not violate the Act by forbidding the T-shirts at issue. According to the Company, the wearing of the T-shirts was not a form of protected activity within the meaning of section 7 of the Act. Section 7 guarantees employees the "right to self-organization ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The ALJ found that in wearing the T-shirts, the employees had no legitimate or concerted purpose under section 7 because the strike was over and the employees' expression of discontent was made in a manner that "can only prolong ill feelings and poor labor relations." The Board specifically disagreed, finding that the T-shirts were intended to promote employee solidarity on a matter of mutual concern to employees. According to the Board, the conclusion of the strike and the signing of a collective bargaining agreement did not render the employees' conduct unprotected.

█ We conclude that even if the T-shirts were intended to promote employee solidarity, the Company did not violate the Act by prohibiting them. There are a number of cases affirming the right of employees to display union insignia or wear apparel proclaiming union support. See, e.g., *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801–03, 65 S.Ct. 982, 987, 89 L.Ed. 1372 (1945). But as the Court made clear in *Republic Aviation*, the employees' right to display union-related messages, which is part of their right to organize, must be balanced against "the equally undisputed right of employers to maintain discipline in their establishments." Id. at 797–98, 65 S.Ct. at 985; see also *NLRB v. Floridan Hotel, Inc.*, 318 F.2d 545, 547 (5th Cir.1963).

█ As a general rule, the balance must tip against rules restricting employees' right to wear union-related insignia or attire, unless the employer demonstrates "'special circumstances' showing that such a rule is necessary to maintain production and discipline." *Floridan Hotel, Inc.*, 137 N.L.R.B. 1484, 1486 (1962), enforced, *NLRB v. Floridan*, supra, 318 F.2d 545. Special circumstances have been found in a variety of situations. See generally *Pay'n Save Corp. v. NLRB*, 641 F.2d 697, 700 (9th Cir. 1981) (listing examples of special circumstances); *Southwestern Bell Telephone Co.*, 200 N.L.R.B. 667, 670 (1972) (same). In *Caterpillar Tractor Co. v. NLRB*, 230 F.2d 357, 358–59 (7th Cir.1956), the court ruled that the employer could legitimately ban union buttons bearing the slogan "Don't be a Scab," since such buttons could be a "disruptive" influence on work and discipline. In *Davison-Paxon Co. v. NLRB*, 462 F.2d 364, 368–69 (5th Cir.1972), a fashionable department store was allowed to prohibit large union campaign buttons because of the store's legitimate concern over the appearance of its sales personnel, and the possibility that the buttons would further disrupt relations between pro-union and anti-union employees. In *Southwestern Bell*, the Board ruled that the employer could legitimately prohibit employees from wearing sweatshirts bearing the slogan "Ma Bell is a Cheap Mother." According to the Board,

> In view of the controversial nature of the language used and its admitted susceptibility to derisive and profane construction, Respondent could legitimately ban the use of the provocative slogan as a reasonable precaution against discord and bitterness between employees and management, as well as to assure decorum and discipline in the plant.

*Southwestern Bell*, supra, 200 N.L.R.B. at 670. After reviewing much of the relevant case law in this area, the Board concluded:

> These and other decisions reflect the general rule that when employee conduct "exceeds the bounds of legitimate campaign propaganda or is so disrespectful of the employer as seriously to impair the

maintenance of discipline," the discipline meted out to the offending employee, even in the drastic form of discharge, does not constitute an unfair labor practice.

Id.

The T-shirts at issue in this case could not be construed as profane. Nonetheless, as the ALJ found, the T-shirts' message was "offensive in that it portrayed, by the cracked logo, that the respondent company was crumbling or disintegrating." We recognize that this is not the only conceivable interpretation of the cracked logo, but the logo could readily be so construed. Thus, even though the T-shirts did not directly comment on the quality of the employer's product, and were therefore not disparaging in the usual sense, see *NLRB v. New York University Medical Center,* 702 F.2d 284 at 292 (2d Cir.1983), we think that this public utility, which constantly dealt with the public, had a legitimate concern that the T-shirts might improperly suggest to the public that the Company was in some way coming apart. In a somewhat analogous case, an employer ordered two employees not to wear T-shirts bearing the slogan "I'm tired of bustin' my ass," not because the employer considered the slogan vulgar, but because it thought the slogan was "unfair and inaccurate," and conveyed an improper inference to outsiders. *Borman's, Inc.,* 254 N.L.R.B. 1023, 1024–25 (1981). The Board held that the employer's action constituted an unfair labor practice, but the Sixth Circuit reversed, holding that the wearing of the T-shirts did not constitute a protected activity. *Borman's, Inc. v. NLRB,* 676 F.2d 1138 (6th Cir.1982). Cf. *Davison-Paxon Co.,* supra, 462 F.2d at 368–69 (concern over public appearance of sales personnel in fashionable store legitimate.) There is testimony in the record that a number of the employees suspended for wearing the T-shirts had regular contact with the public while at work, and that many of them were likely to have some contact with the public during the course of the day.

In addition, we agree with the ALJ that the circumstances surrounding the decision to ban the T-shirts support the conclusion that the Company did not improperly interfere with the employees' protected union activities. The T-shirts bore no union insignia, but rather the Company's trademark. There was no evidence that the Company was anti-union, or that it made any effort to penalize T-shirt wearers except for the wages lost while they procured alternate apparel. Thus, the six employees who had other clothes with them suffered no penalty at all. Moreover, the T-shirts were first worn three months after the end of a 19-week strike and the signing of a collective bargaining agreement. According to one Company official, the T-shirts were a way of "keeping the wounds [from the strike] open." This is particularly accurate, since the shirts referred not just to the last strike, but to two earlier ones as well. The ALJ found that the Company's "conduct was legitimately motivated in order to maintain discipline and harmonious employee-management relations," a factor that in other cases has supported a finding that an employer could properly ban union-related attire. See, e.g., *Southwestern Bell,* supra, 200 N.L.R.B. at 670. Finally, we note that the T-shirts here had the same potential to serve as a "constant irritant" to management as the sweatshirts worn in *Southwestern Bell.* See *New York University Medical Center,* supra, at 290.

Considering all of these factors together, we think the employer had a legitimate interest in prohibiting the T-shirts, which outweighed the employees' ill-defined interest at the relevant time in promoting union solidarity in this manner. Accordingly, we reverse the decision of the Board on this issue. Given our resolution of this question, we need not rule on the Company's contention that the depiction of the company logo on the T-shirts constitutes a trademark infringement.

## II. Reimbursement for Employee Negotiators

Midstate claims that its failure to pay the per diem, travel, and lodging ex-

penses of employee negotiators for bargaining sessions held during the strike was not an unfair labor practice. The Company argues first that it was not contractually obligated to make such payments. According to Midstate, the procedural agreement, which provides for reimbursement of employee negotiators' expenses, expired at the same time as the underlying collective bargaining agreements. Although there is no expiration date to the supplemental agreement, the Company contends that the parties "assumed" the agreement would expire along with the collective bargaining agreements. But the ALJ found, and the Board apparently agreed, that the agreement was intended to remain in effect until a new joint collective bargaining agreement was reached. It appears that all other provisions of the agreement were observed until the new pact was reached. Moreover, the Company, which drafted the agreement, could have specified an earlier expiration date if that was its intention. The impetus for a joint agreement covering three units, one of which was 200 miles away from the others, came from the Company; it obviously recognized that some employee negotiators would have to travel substantial distances to attend the negotiations until they were concluded. Under the circumstances, we cannot say that the Board erred in determining that the agreement remained in force during the strike.

The Company argues that even if the agreement was in force during the strike, the Company's "good faith" refusal to pay the disputed expenses did not violate the Act. The Board, however, makes the opposite argument: that even if the agreement had expired, the Company's refusal to reimburse the employee negotiators violated §§ 8(a)(1) and (5) of the Act. We agree with the Board's position.

■ We think substantial evidence supports the Board's determination that Midstate violated §§ 8(a)(1) and 8(a)(5) of the Act by refusing to reimburse employee negotiators for bargaining session expenses incurred during the strike. Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with employees' right to engage in concerted activity for mutual aid, in this case, with their right to strike. Section 8(a)(5) requires an employer to bargain collectively with employees' representatives concerning the terms and conditions of employment. It is well established that under § 8(a)(5), as defined in part by § 8(d), an employer may not unilaterally modify or repudiate a contract provision relating to a mandatory subject of collective bargaining. *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 185–86, 92 S.Ct. 383, 400–401, 30 L.Ed.2d 341 (1971). The Board has previously held that reimbursement of negotiators' lost wages constitutes a term or condition of employment that is a mandatory subject of bargaining. See *Axelson, Inc.,* 234 N.L.R.B. 414, 415 (1978), enforced, 599 F.2d 91, 94–95 (5th Cir.1979). In this case, the Board determined, and we agree, that reimbursement of per diem, travel, and lodging expenses similarly involves a mandatory subject of bargaining because it "inure[s] to the benefit of all of the members of the bargaining unit by contributing to more effective collective-bargaining representation and thus 'vitally affect[s]' the relations between an employer and employee." Id. at 415. Thus, by unilaterally discontinuing reimbursement payments, the Company violated §§ 8(a)(1) and 8(a)(5) of the Act.

■ This holds true even if—contrary to the Board's view and our own—the ground rules agreement had expired. For as the Board points out, it is well settled that an employer may not unilaterally alter an existing term or condition of employment without first notifying and bargaining with the Union. See *Firch Baking Co. v. NLRB,* 479 F.2d 732, 735 (2d Cir.), cert. denied, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973).

The Board's finding that the Company violated § 8(a)(3) by refusing to reimburse the expenses of the employee negotiators is also supported by substantial evidence. The Supreme Court has held that:

Under § 8(a)(3), it is unlawful for an employer by discrimination in terms of employment to discourage "membership in any labor organization," which includes discouraging participation in concerted activities . . . such as a legitimate strike. *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963) (citations omitted).

Discrimination under § 8(a)(3) need not consist of a disparity in the treatment of different classes of employees. *NLRB v. Borden, Inc.*, 600 F.2d 313, 320 (1st Cir. 1979), remanded and aff'd after remand, 645 F.2d 87 (1st Cir.1981). As the First Circuit noted, the Act "speaks to discrimination on the basis of union activity." Id. In the case now before us, the Board found that discontinuing the expense payments attached a penalty to strike activity. In that sense, the Company's action was discriminatory within the meaning of § 8(a)(3).

The standard for determining whether such action violates § 8(a)(3) is set forth in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967) (emphasis in original):

> From this review of our recent decisions, several principles of controlling importance here can be distilled. First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon

the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

The Board found in this case that the refusal to pay negotiating expenses was inherently destructive of employee rights, and therefore a violation of § 8(a)(3). We believe that this was correct. By discontinuing travel and per diem payments to employee negotiators once the strike began, the Company penalized the employees for going out on strike. There is evidence that the Company's chief negotiator told the Union that his own personal view was that he didn't think the negotiators "should be paid if [they] were on strike" and not working, although this was not the Company's stated rationale. But the payments to the negotiators were not wages for working, which would cease when the work did. The payments were part of an agreement by which the Company had secured the Union's assent to joint negotiations at a place 200 miles from the area where some of the negotiators worked. This does not mean, of course, that the Company had to agree in the first place to reimburse the negotiators. But having done so, it could not simply cancel the agreement because the Union was on strike.

Moreover, the Board was entitled to reject the Company's defense that its decision not to pay the amounts in question was made in good faith and was based on the reasonable belief that the procedural agreement had expired. In support of its argument, the Company cites *Vesuvius Crucible Co. v. NLRB,* 668 F.2d 162 (3rd Cir.1981). In that case, the employer refused to pay accrued vacation benefits to striking employees because of its "legitimate and good faith interpretation of the expired contract." Id. at 166. The Board rejected the employer's argument because the Board found that the employer's interpretation of the contract was incorrect. The Third Circuit ruled in favor of the employer, holding that

> in the absence of proof of anti-union motivation or a finding that the company's

conduct was inherently destructive of employee rights, a non-discriminatory refusal to pay benefits to all employees based on a good faith interpretation of the labor contract is insufficient to make out a violation of the National Labor Relations Act.

Id. at 168 (footnote omitted).

We think, however, that this case is closer to *NLRB v. Borden, Inc.*, 645 F.2d 87 (1st Cir.1981), in which the employer's actions undercut its alleged good faith reliance on the terms of the collective bargaining agreement. In this case, although the Company repudiated its obligation to pay negotiating expenses, it nonetheless continued to act as if the procedural agreement were otherwise still in effect. Thus, the Company continued the joint negotiating procedures that it had initiated until a new, single collective bargaining agreement was reached, which was ratified in accordance with the ground rules agreement.

■ In any event, we agree with the Board's finding that the failure to pay the expenses at issue was inherently destructive of employee rights. Therefore, "the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations." *Great Dane*, supra, 388 U.S. at 34, 87 S.Ct. at 1797; see *NLRB v. United Aircraft Corp.*, 490 F.2d 1105, 1110 (2d Cir. 1973); cf. *NLRB v. Martin A. Gleason, Inc.*, 534 F.2d 466, 471–74 (2d Cir.1976). Accordingly, even if the Company's conduct was predicated on a good faith interpretation of the contract, that is not dispositive. Cf. *NLRB v. M & M Oldsmobile, Inc.*, 377 F.2d 712, 716 (2d Cir.1967) (in some situations "it is not enough that an employer is convinced he is right"). On the record before us, we do not feel justified in overriding the Board on this issue.

For the reasons stated above, we enforce that portion of the Board's order relating to the per diem, travel and lodging expense issue, and deny enforcement of that portion of the Board's order relating to the wearing of the disputed T-shirts.