**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The MEAD CORPORATION d/b/a Escanaba Paper Company, Respondent.**

No. 94–6250.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 27, 1995.

Decided Jan. 8, 1996.

76

Aileen A. Armstong, Deputy Assoc. Gen. Counsel, Frederick C. Havard (briefed), Christopher Young (argued and briefed), N.L.R.B., Washington, DC, for Petitioner.

Robert Joseph Brown (argued and briefed), Todd D. Penney, Thompson, Hine & Flory, Dayton, OH, for Respondent.

Before: MARTIN and JONES, Circuit Judges; COHN, District Judge.*

MARTIN, J., delivered the opinion of the court, in which JONES, J., joined. COHN, D.J. (p. 81), delivered a separate dissenting opinion.

BOYCE F. MARTIN, Jr., Circuit Judge.

The National Labor Relations Board petitions this Court to enforce the Board's cease and desist order against Mead Corporation. *Mead Corp.*, 314 N.L.R.B. 732 (1994). The Board found that Mead had committed an unfair labor practice in violation of Section

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1988), by prohibiting employees from wearing certain buttons, t-shirts, and other clothing which protested the terms and conditions of their employment. As a predicate to finding that Mead violated Section 8(a)(1), the Board found that the buttons, t-shirts, and other articles of clothing were worn in exercise of the employees' rights under Section 7 of the Act, 29 U.S.C. § 157 (1988). Mead responds to this petition by arguing that the buttons, t-shirts and other material banned were not protected under Section 7 of the Act. Alternatively, Mead argues that, even if the banned materials were protected under the Act, special circumstances existing at the time it prohibited the employees from wearing the contested materials warranted infringement on its employees' exercise of their protected rights.

We believe the NLRB's conclusion that Mead violated Section 8(a)(1) of the Act to be supported by substantial evidence in the record as a whole.

Mead Corporation operates a paper mill in Escanaba, Michigan that manufactures and distributes news print paper. Mead employs approximately 1500 employees at the Escanaba mill, about 1050 of whom are unionized. The mill produces one-half billion tons of paper annually.

In March of 1989, the Company and the Unions began negotiations for new collective bargaining labor agreements. The parties had difficulty in coming to an agreement, primarily because Mead introduced new operating flexibility plans that received strong opposition from the Unions. The "Flex I" plan required all production and maintenance personnel to assume additional responsibilities in exchange for an hourly wage increase. The "Flex II" proposal permitted maintenance employees skilled in a particular "craft" to qualify in two additional crafts, for which they would receive a wage increase of fifty cents an hour for each additional craft.

The Unions opposed the flexibility plans, particularly the "Flex II" plan, because they believed the plans would lead to a loss of work. Beginning in June of 1989, the Unions encouraged members to wear various buttons and t-shirts opposing the Flex proposals.

The buttons and t-shirts bore the legends "Just Say No—Mead" and "Hey Mead—Flex This." The union employees continued to wear these emblems throughout the course of the collective bargaining negotiations.

In October of 1989, Mead declared an impasse, terminated the former labor agreements, and unilaterally implemented several of its final proposals, including the Flex I plan. Mead and the Unions finally concluded negotiations in November of 1989, and new collective bargaining agreements went into effect. In opposition to Mead's unilateral action, the Unions issued, and union members wore, buttons proclaiming "Remember 89." In addition, as a result of Mead's unilateral action and the new labor agreements, the Unions withdrew from a popular "Continuous Improvement" program, an older program designed to enhance plant production and safety. The Unions then issued buttons and t-shirts commemorating the withdrawal, which stated "C.I. 1983–1989 is 'Dead'." Finally, after Mead began implementing the Flex II program in June of 1990, Union employees wore "No Scab" buttons which, according to Mead, were worn in opposition to those employees participating in the Flex I and II programs. The Union claimed that the buttons were directed toward the striker replacements used by Greyhound and Eastern Airlines in their own labor negotiation turmoils. Employees also began wearing "Remember Wagner, Oct. 1, 1989" buttons in reference to the suspension of union member Mike Wagner. The union employees believed that Wagner had been suspended as a reprisal for his opposition to Mead's bargaining proposals.

In September of 1990, Mead requested that Union members refrain from wearing the "No Scab" buttons. In October of 1990, without any investigation and without notice, Mead announced that it intended to formally ban certain button, t-shirt, and decal slogans. According to Mead, the slogans at issue were infringing upon its ability to maintain order and discipline in the workplace and were threatening workplace safety. Mead's formal ban announced that all buttons, t-shirts, and decals would be prohibited:

1. When the message conveyed is disrespectful and limits our ability to maintain discipline.

2. When the message is aimed at "keeping the wounds from the 1989 negotiations open."

3. When the message leaves a negative impression on outsiders, particularly our customers/suppliers.

Mead expressly identified the slogans "Hey Mead—Flex This," "Just Say No—Mead," "Remember 89," and "Remember Mike Wagner" as prohibited by the ban. In conjunction with the ban, Mead introduced a system of progressive discipline for displaying any prohibited slogans. The Union subsequently filed unfair labor practice charges against Mead, claiming that Mead's ban violated the Union employees' rights under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1988).

On November 5, 1991, a hearing was held before an administrative law judge. The administrative law judge found that the buttons, t-shirts, and decals at issue were protected under Section 7 of the Act, and that Mead violated Section 8(a)(1) of the Act by prohibiting its employees from wearing any of these items. The Board subsequently affirmed the administrative law judge's rulings, findings, and conclusions, and adopted his order as slightly modified. The Board's order requires Mead to cease and desist from prohibiting the exercise of its employees' rights under Section 7 of the Act, and requires Mead to post copies of an appropriate notice in the workplace informing Mead employees of the termination of its ban on union insignia.

■ We review the Board's findings of fact to determine if they are supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). Evidence is substantial when, viewing the record as a whole, reasonable minds would find the evidence sufficient to uphold the Board's decision. *NLRB v. Spring Arbor Dist. Co.,* 59 F.3d 600, 604 (6th Cir.1995) (citations and quotations omitted). "The Board's application of the law to particular facts is also reviewed under the substantial evidence standard." *East Tennessee Baptist Hosp. v. NLRB,* 6 F.3d 1139, 1143 (6th Cir.1993). This Court will not reverse the Board's reasonable inferences even if we would have decided the issue differently. *Id.* (citations omitted).

■ Under Section 8(a)(1) of the Act, it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed under [Section 7]" of the Act. 29 U.S.C. § 158(a)(1) (1988). Section 7 of the Act confers upon employees the right engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1988). Employees' Section 7 rights include the right to wear union-related insignia while at work to show support for the Union and their fellow Union members. *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 802–03, 65 S.Ct. 982, 987–88, 89 L.Ed. 1372 (1945); *Larand Leisurelies, Inc. v. NLRB,* 523 F.2d 814, 818–19 (6th Cir.1975). Balanced against the employees' rights under Section 7 is the "equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation,* 324 U.S. at 798, 65 S.Ct. at 985. "Opportunity to organize and proper discipline are both essential elements in a balanced society." *Id.*

■ In this case, the Board found that the Union employees' display of pro-union, anti-employer, anti-agreement sentiments— through the use of buttons, t-shirts, and decals—was a protected activity under Section 7. Mead takes issue with this conclusion, arguing that the anti-Flex and various other slogans at issue in this case do not fall within the ambit of Section 7, and that, in any event, the employees waived their right to campaign against the Flex program once they ratified the collective bargaining agreement.

We disagree. Substantial evidence supports the Board's conclusion that Union employees wore the slogans at issue here for mutual aid and support both during and after the contract negotiations with Mead. Each of the slogans is directly related to the labor contract negotiations or to specific incidents arising, or so the Unions reasonably believed,

out of the management-labor dispute. As such, these slogans are unlike the slogan at issue in *Borman's, Inc. v. NLRB*, 676 F.2d 1138, 1139 (6th Cir.1982), in which we held that the statement "I'm tired of bustin' my ass" was unrelated to the exercise of any Section 7 rights. Instead, the slogans at issue here are more analogous to those worn by employees in *Pay'n Save Corp. v. NLRB*, 641 F.2d 697, 699–701 (9th Cir.1981), in which the Ninth Circuit held that the buttons "Vote Yes Retail Clerks Union AFL–CIO," worn in support of Union organization, were protected under Section 7 of the Act.

Further, the Union members did not waive their right to exercise their Section 7 rights by signing the labor agreement. Although unions may certainly waive statutorily created rights during the bargaining process, this waiver must be "clear and unmistakable." *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *East Tennessee Baptist Hosp.*, 6 F.3d at 1144. Waivers of statutory rights are often used as bargaining chips by Unions in order to gain concessions from employers while negotiating a new collective bargaining agreement. It would be hard to read into a labor agreement a waiver of rights as important as those contained in Section 7 absent language specifically addressed to waiver of that right. The record does not support Mead's argument that the union members impliedly waived their right to protest certain aspects of the collective bargaining agreement simply because they ratified the agreement.

We turn now to Mead's contention that special circumstances existed in this case which permitted Mead's infringement upon its employees' exercise of their Section 7 rights. Mead claims that its restriction on the display of the slogans at issue was necessary to: 1) maintain discipline in the workplace; 2) discourage perpetuation of labor unrest; and, 3) prevent derogatory messages from being conveyed to the public. According to Mead these "special considerations" warranted its ban. *See Pay'n Save Corp.*, 641 F.2d at 700 (listing cases involving special circumstances).

In order to justify a restriction on employees' exercise of Section 7 rights, an employer must demonstrate "the existence of 'special circumstances' which necessitate the banning of such insignia in order to reduce employee dissension or distractions from work, maintain employee safety and discipline, protect machinery or products, or project a certain image to the public." *Burger King Corp. v. NLRB*, 725 F.2d 1053, 1056 (6th Cir.1984) (Merritt, J., concurring in part and dissenting in part). Special circumstances arise most often where employees have significant contact with the public, *Davison–Paxon Co. v. NLRB*, 462 F.2d 364, 368–69 (5th Cir.1972); where the slogans at issue denigrate the employer's product or business, *Midstate Tel. Corp. v. NLRB*, 706 F.2d 401, 403–04 (2d Cir.1983); and where the slogans are patently offensive or vulgar, *Southwestern Bell Tel. Co.*, 200 N.L.R.B. 667, 670 (1972). Employers may also infringe upon employees' Section 7 rights to the extent necessary to maintain discipline and order in the workplace. *Larand Leisurelies*, 523 F.2d at 818–19. Finally, employers have an interest, where applicable, in dress uniformity where employees have extended contact with the public. *See United Parcel Serv. v. NLRB*, 41 F.3d 1068, 1071–72 (6th Cir.1994).

Mead first argues that its ban on the slogans at issue was necessary to maintain discipline in the workplace. Relying on *Caterpillar Tractor Co. v. NLRB*, 230 F.2d 357, 358–59 (7th Cir.1956), Mead argues that, at least with respect to the "No Scab" buttons, the buttons were inherently disruptive of workplace order. In *Caterpillar Tractor*, the Seventh Circuit apparently adopted a *per se* rule that the term "scab" was inherently disruptive of the workplace and therefore legitimately may be banned by employers. *Id.* However, to the extent that *Caterpillar Tractor* has been interpreted as adopting a *per se* rule allowing employers to ban anything with the term "scab" on it, we decline to follow it. Instead, we believe it more appropriate to balance the employer's need to maintain discipline and order against the union employees' Section 7 rights in each case. *See Linn v. United Plant Workers*, 383 U.S. 53, 60–61, 86 S.Ct. 657, 661–62, 15

L.Ed.2d 582 (1966) (noting that "the Board has concluded that epithets such as 'scab,' 'unfair,' and 'liar' are commonplace in these struggles and not so indefensible as to remove them from the protection of § 7").

Further, we believe that substantial evidence supports the Board's decision that Mead did not justify its ban of the slogans at issue on the ground that its ban was necessary to maintain discipline. Mead introduced evidence of toolbox tampering, graffiti, heated discussions between employees, and alleged "sabotage" to show that its ban was necessary to maintain order. However, the Board found that the evidence of toolbox tampering had been going on for years and was not a result of the current labor strife. Also, the Board noted that some of the graffiti had been on the walls for at least four years, which indicates that it was unrelated to the labor problems occurring in 1989 and 1990. Finally, there was testimony that the alleged sabotage to an oxyacetylene system actually consisted of a valve left open on an acetylene tank during the course of the Flex training. No further incidents involving the acetylene tanks occurred. While it is true that employers need not wait until violence erupts before taking precautionary measures, *Southwestern Bell*, 200 N.L.R.B. at 671, the Board's finding that the precautionary measures were not necessary on the facts presented here is supported by substantial evidence.

■ In addition, we reject Mead's argument that the other banned messages were inherently disruptive because they "blatantly urge insubordination, destructiveness and defiance." The slogans "Hey Mead–Flex This," "Just Say No—Mead," and "Remember Wagner '89" certainly do show discontent, even anger, arising out of the 1989 contract negotiations. However, they do not urge employees to stop doing their jobs or to refuse to listen to their supervisors. In fact, production was up significantly at the Mead plant during most of the period in question. In sum, we believe substantial evidence supports the Board's determination that Mead's ban was not necessary to maintain discipline and order in the workplace.

Mead also argues that the ban served the legitimate purpose of discouraging perpetuation of labor unrest at the Mead plant. Mead claims that, because the labor negotiations concluded and the labor contracts were signed in late 1989, the continued display of the anti-Mead slogans simply kept the wounds open from the 1989 negotiations and served as a "constant irritant" to management. *See Midstate Tel. Corp.*, 706 F.2d at 404. However, we do not read *Midstate* as permitting employer bans on pro-union messages every time the message happens to refer to a past confrontation between management and the unions, nor do we believe *Midstate* stands for the proposition that employers may ban slogans simply because they serve as a "constant irritant" to management. Although these may be facts relevant to determining whether management is justified in banning union insignia in each case, we believe the important factor in *Midstate* is that the t-shirts at issue in that case implied to the public that the public utility company "was in some way coming apart." *Id.* Here, the slogans almost certainly did irritate management, in part because Mead was operating under a labor contract ultimately unsatisfactory to many Mead union employees. However, we do not believe the slogans imply that Mead is "coming apart" or that Mead's product is somehow defective.

■ Finally, Mead contends that its ban was necessary to prevent derogatory messages from being conveyed to the public. Mead claims that the slogans presented a substantial negative inference to customers and other outsiders who visited its Escanaba plant, and that its ban simply protected its legitimate interest in maintaining a positive public image. However, the slogans at issue in this case do not infringe upon Mead's public image. Unlike *Southwestern Bell*, 200 N.L.R.B. at 670, the slogans are not profane. *See also Borman's*, 676 F.2d at 1139 (upholding ban where slogan contained profanity). Further, unlike the slogans in *Midstate*, the slogans at issue here do not denigrate Mead's product, nor do they ridicule the company itself. Instead the slogans simply express the union members' dissatisfaction with management over labor issues. Only the slogan "Just Say No—Mead" arguably

could be interpreted as implying that one should not purchase Mead's products. However, we believe that, given the fact that Mead employees were seldom in contact with the public, any negative effect the slogan had on Mead's customers, suppliers, and periodic visitors was negligible. In any event, it did not justify the absolute ban on pro-union slogans ultimately adopted by Mead.

In sum, we believe the Board's decision to be supported by substantial evidence. Accordingly, we ENFORCE the Board's order.

COHN, District Judge, dissenting.

The record does not support the conclusion that there is sufficient evidence that the wearing of the buttons did not interfere with maintenance of discipline and order in the workplace. Because participation in Flex II was voluntary, Mead found itself post-contract ratification with employees working side-by-side, doing the same job, but being paid differently. The button wearers were protesting the two-level pay scale and were accusing fellow workers of being "scabs." This was, in my view, the necessary special circumstance that allowed for the ban.

The Board's determination that there was no evidence that the slogans were likely to result in a loss of discipline makes one wonder what would have sufficed short of a physical confrontation. The record contains several photographs of obviously Flex-related and hostile graffiti which the administrative law judge and the Board noted, but did not address.[1] In their decisions, each addressed only the photograph depicting graffiti that predated the Flex controversy and then concluded that Mead's evidence of vandalism consisted of "unsupported subjective impressions."

While there are limitations on an employer's right to restrict rights guaranteed workers by law, the employer should not have to wait until an incident occurs to take preven-

tative measures. The employer here was doing no more than that.

---

1. According to the administrative law judge:
"Two of the pictures show graffiti referring to the Flex II participants as "scabs" and making obscene remarks about them. Of the remaining four photographs, one shows graffiti referring to Flex II in an obscene manner, one refers to Flex II participants as "scabies," one asserts that the "Union" "makes the choice for you in Flex II," and the fourth, shows "scab" inscribed on the door of a locker. This locker is used by a supervisor. Also, when the picture was taken, the "scab" inscription had been on its door for approximately four years."