**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 05a0214n.06
Filed: March 25, 2005

**Nos. 03-2540, 04-1010**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **OBSERVER & ECCENTRIC NEWSPAPERS, INC.,** | ) ) ) ) | ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD (No. 7-CA-44695) |
|     Petitioner/Cross-Respondent, | ) ) | |
| **v.** | ) ) | |
| **NATIONAL LABOR RELATIONS BOARD,** | ) ) | OPINION |
|     Respondent/Cross-Petitioner. | ) ) ) | |

BEFORE:    MOORE and GILMAN, Circuit Judges; and GWIN, District Judge.[*]

Gwin, District Judge:

With this petition, we consider whether substantial evidence supports the National Labor Relations Board's ("the Board") determination that Observer & Eccentric Newspapers, Inc. ("Observer") violated Section 8(a)(1) of the National Labor Relations Act ("NLRA") by unlawfully interrogating an employee. 29 U.S.C. § 158(a)(1). The Board found that Petitioner Observer unlawfully interrogated employee Donna Gregway ("Gregway") about current union activities. Also with this petition, we consider the Board's cross-application for enforcement.

For the following reasons, we **AFFIRM** the decision of the Board in these consolidated cases, thus **GRANTING** the Board's petition for enforcement of the Board order and **DENYING**

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

the Observer's petition for review.

## I. FACTUAL BACKGROUND

The Observer publishes community newspapers in the greater metropolitan Detroit area. Although some departments of the Observer are unionized, the employees in the business office are not. Complainant Anne Grabda ("Grabda") and Gregway worked in the business office. This case concerns whether the Observer violated the NLRA in laying off Complainant Grabda and in interrogating Gregway and Grabda during discovery for a state-court lawsuit.

A. <u>1997 Union Campaign</u>

During a 1997 union campaign, several employees from the business office met with representatives from a union that represented the Observer's editorial department employees. Jean Podrasky ("Podrasky"), Grabda, and Gregway held meetings of union supporters at their homes.

The Observer opposed the union campaign. As detailed in the Administrative Law Judge's ("ALJ") decision, the Observer's General Manager conducted meetings with employees to "discourage them from organizing the business office." The General Manager also sent each employee a letter, which advocated that "we do not need or want our non-union employees to be represented by a union." Less than one week after sending the letter to employees, the Controller sent a letter to the General Manager and Vice President of Human Resources, which urged that the company take "a defensive position" in response to the union. The Controller also recommended that the company "fire[] Jean Podrasky NOW" to send a message that employees should not engage in union activities on company time.

The business office employees' 1997 campaign to obtain union representation failed. In 1998, and after the union campaign failed, Lisa Gorno ("Gorno"), who is the Human Resources Director, questioned at least one employee about ongoing efforts to organize.

B. Podrasky and Egnatowski Lawsuit

In February 2000, the Observer fired two business office employees, Podrasky and Linda Egnatowski ("Egnatowski"). After being fired, Podrasky and Egnatowski filed suit against the Observer in Michigan state court. They alleged that the Observer committed age discrimination and wrongfully discharged them based upon a perception that they supported the union during the 1997 campaign among the business office employees.

Attorney Mark Heusel ("Heusel") represented the Observer in the Podrasky and Egnatowski litigation. In February 2001, Heusel deposed Podrasky. During her deposition, Podrasky listed several business office employees who were involved in the unsuccessful 1997 union campaign, including Grabda, Gregway, and Lucy Caulford ("Caulford"). On May 15, 2001, Heusel received a witness list from counsel for Podrasky and Egnatowski. The witness list included the names of business office employees, who were potential witnesses. After receiving the witness list, Heusel sought to interview several business office employees, including Grabda and Gregway.

C. Heusel and Gorno's Interviews

In August 2001, Human Resources Director Gorno scheduled interviews with the employees on Heusel's behalf. Human Resources Director Gorno and Heusel then conducted individual interviews with several employees. Attorney Heusel interviewed Gregway and Grabda. He did not interview Caulford. At the interviews, Heusel explained to the employees that the purpose of the interview was to gather information for the Podrasky and Egnatowski litigation, whether such information was helpful or harmful for the company. Gorno attended each interview and took notes, but the Board has no written transcript of the interviews. Other than Heusel, Gorno, and the employee being interviewed, no one else was present.

1. Grabda's Interview

Heusel and Gorno interviewed Grabda, who was an open union supporter. At the ALJ hearing, Grabda testified that "[t]hey told me that – right up front, that they already knew that I was part of the Union organization back in 1997-98, and they knew that I had meetings at my house and at [Gregway's] house and at Jean Podrasky's house." Grabda further testified that Heusel said, "We know that you were [an] active member in the organization – organizing drive." Grabda recalled another exchange with Heusel: "He said, well you know, the Union activity stopped in 1998, and I said no, that they hadn't stopped. People are still talking about it. And he said, 'Oh they are?' He said, 'Are you?' And I said, 'Well, I don't really think I should answer that.' And he didn't push that question any further." On December 10, 2001, the Observer laid Grabda off.

2. Gregway's Interview

Heusel and Gorno also interviewed Gregway. Unlike Grabda, Gregway was not an open union supporter. However, Heusel knew that Gregway supported the organizing effort from the earlier testimony given by Podrasky. During the interview, Heusel asked Gregway why the business office employees were interested in starting a union. Gregway responded, "[W]e were unpaid [sic] and we were tired of the way we were treated." Heusel also asked Gregway whether employees were still talking about the union. Gregway responded, "Yes." Gorno then exclaimed, "What! We're still talking about the union?" Gregway, again, said, "Yes." At the conclusion of the interview, Gorno again asked Gregway: "Are they still talking about the union?" For the third time, Gregway responded "yes." The General Counsel alleged that this questioning, which he contended had no relation to the state-court lawsuit, interfered with Gregway's right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

II. PROCEDURAL BACKGROUND

Complainant Grabda filed charges with the Board against the Observer. On March 29, 2002,

Region Seven of the Board issued a complaint alleging an unfair labor practice. First, the complaint alleged that the Observer violated Sections 8(a)(3) and (1) of the NLRA, 29 U.S.C. § 158 (a)(3) and (1), by discriminating against Grabda for her union activities.

Second, the complaint alleged that the Observer violated Section 8(a)(1), 29 U.S.C. § 158(a)(1), by interrogating employees in a way that had a reasonable tendency to interfere with, restrain, or coerce them in the exercise of their protected rights under Section 7 of the NLRA.

A. The ALJ Opinion

On June 18 and 19, 2002, the ALJ tried the case and, on September 23, 2002, issued an opinion. In that opinion, the ALJ found that the Observer did not violate Sections 8(a)(3) and (1) of the NLRA when it laid Grabda off. However, the ALJ found that the Observer violated Section 8(a)(1) of the NLRA by interrogating employees about pending union efforts without providing the assurances described in *Johnnie's Poultry*, 146 N.L.R.B. 770 (1964), *enforcement denied on other grounds*, 344 F.2d 617 (8th Cir. 1965).

After receiving conflicting testimony about whether Heusel gave the *Johnnie's Poultry* assurances to the employees, the ALJ found that Heusel and Gorno failed to inform the employees "that they could decline to be interviewed and that they would not experience retaliation on account of their answers or their refusal to be interviewed." In this finding, the ALJ found Gregway credible and discredited contrary testimony from Heusel and Gorno. In finding Heusel less credible, the ALJ observed that Heusel could not "specifically recall whether or not he gave these assurances to Grabda and Gregway." Instead, Heusel only testified about his general practice when interviewing employees of his clients. Finding Gregway credible, the ALJ concluded that the Observer unlawfully interrogated Gregway in violation of Section 8(a)(1).

B. The Board Opinion

The Observer appealed the ALJ's ruling regarding Section 8(a)(1) to the Board. On September 11, 2003, the Board affirmed the ALJ's order. The Board adopted the ALJ's finding that the Observer did not violate the NLRA when it laid Grabda off in December 2001. The panel majority also concluded that the Observer violated Section 8(a)(1) in interrogating Gregway, although it modified the ALJ's analysis. Instead of applying the *Johnnie's Poultry* standard, the Board applied the totality-of-the-circumstances test from *Rossmore House*, 269 N.L.R.B. 1176 (1984), *aff'd sub nom. Hotel Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985). The Board found that Heusel and Gorno asked Gregway questions concerning employees' union activities as of August 2001, even though the stated purpose for the interview was to defend against Podrasky's and Egnatowski's wrongful discharge claim arising out of a 2000 discharge.

To remedy the Section 8(a)(1) violation, the Board adopted the ALJ's recommended order. That recommended order required the Observer (1) to cease and desist its unlawful conduct, and (2) to post copies of a remedial notice informing employees of their rights to organize and of the Board's decision that the Observer violated the NLRA. Because an additional violation would be cumulative and would not affect the remedy, the Board did not determine the legality of Grabda's interview.

Member Schaumber dissented, arguing that Gregway's interview was not coercive under the totality-of-the-circumstances test. Member Schaumber disagreed with the majority's characterization of the facts. The majority found that Heusel and Gorno "repeatedly" asked Gregway about current union activities after finding that they asked her three times. Member Schaumber disagreed that this should be characterized as "repeatedly."

C. The Observer's Petition for Review

On December 1, 2003, the Observer filed a petition for review of the Board's decision and

order. The Observer prays for this Court to set aside the order, adopt the dissenting opinion of Member Schaumber, and deny the Board's cross-application for enforcement.

On December 23, 2003, the Board filed a cross-application to enforce its decision and order. The General Counsel argues that substantial evidence supports the Board's finding that the Observer violated Section 8(a)(1) by interrogating Gregway about current union activities.

We ordered the two cases consolidated and we now review the decision of the Board.

### III. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction to review final orders of the Board pursuant to Sections 10(e) and (f) of the NLRA, 29 U.S.C. § 160(e) and (f). The Board issued its final order on September 11, 2003. The Observer and the Board timely filed their respective petitions.

We defer to the Board's findings of fact where those findings are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Peters v. NLRB*, 153 F.3d 289, 294 (6th Cir. 1998). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495 (6th Cir. 2002). Where substantial evidence supports a Board decision, we must uphold that decision, "even though we might justifiably have made a different choice had the matter been before the court de novo." *NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 105 (6th Cir. 1987).

"Deference to the Board's factual findings is particularly appropriate where the record is fraught with conflicting testimony and essential credibility determinations have been made." *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987) (internal quotation marks omitted). Credibility determinations "are entitled to great weight. We will overturn those determinations only if they overstep the bounds of reason." *Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir. 1984)

(per curiam) (internal quotation marks and citations omitted). However, we also consider evidence in the record that detracts from the Board's findings.

As with the Board's factual findings, we review the Board's application of law to facts under the substantial evidence standard. *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996); *NLRB v. Mead Corp.*, 73 F.3d 74, 78 (6th Cir. 1996). We "may not displace reasonable inferences of the Board." *See Pikeville United Methodist Hosp. v. United Steelworkers of Am.*, 109 F.3d 1146, 1154 (6th Cir. 1997).

With the standard of review in mind, we consider the Observer's petition.

## IV. DISCUSSION

In this opinion, we address four arguments that the Observer advances to assail the Board's opinion. First, we determine whether the Board's findings of fact and credibility determinations are entitled to deference. Second, we evaluate the Observer's argument that it did not violate Section 8(a)(1) because Heusel and Gorno did not ask Gregway about her Section 7 rights. Third, we assess whether substantial evidence supports the Board's decision that the Observer's interrogation had a tendency to coerce Gregway, as determined by the *Rossmore House's* totality-of-the-circumstances test. Finally, we consider the Observer's contention that it was privileged to question Gregway because of the pending state-court lawsuit.

### A. Credibility Determinations and Factual Findings

Throughout its brief, the Observer claims that the Board erred in its factual findings and credibility determinations. We are reluctant to reverse the Board's finding that Gregway's testimony was credible because the record includes conflicting testimony. The "assignment of credibility to witnesses is the prerogative of the Board." *Pikeville United Methodist Hosp.*, 109 F.3d at 1154 n.7 (internal quotation marks omitted). This Court is "uniquely unsuited to pass upon the legitimacy

of such disputes when sworn testimony is offered on both sides of an issue." *Kamtech, Inc. v. NLRB*, 314 F.3d 800, 812 (6th Cir. 2002); *see Tony Scott Trucking*, 821 F.2d at 315.

The Observer argues that the Board erred in failing to credit testimony from Heusel, Gorno, and Mary Ann Smith ("Smith"). As for Heusel, the Observer asserts that the Board failed to credit testimony concerning what assurances Heusel offered and what questions he asked during Gregway's interview. Yet the record shows that Heusel testified that he had no specific recollection of what he actually said to Gregway. Instead, he testified only regarding his "general practice" while interviewing employees of his clients. The Board adequately explained its reasons for failing to credit Heusel's testimony.

Likewise, the Board offered sufficient explanation for discrediting Gorno's testimony that she acted merely as a silent note-taker and did not speak during the interview. Gorno's testimony contradicted that of Gregway, who testified that Gorno posed several questions concerning employees' current union support. Where their testimony conflicted, the Board credited Gregway and found that Gorno asked about employees' current union activities. The ALJ observed Gorno's and Gregway's testimony, and heard more than sufficient evidence to support Gregway's version.

Finally, Smith's testimony is insufficient to overturn the Board's decision that Gregway was credible. Smith testified that Heusel assured her that participation in the interview was voluntary. Even if it were true that Heusel gave Smith assurances that she would not suffer reprisal, this does not affect the Board's finding that Heusel and Gorno failed to provide similar assurances to Gregway. As the Executive Secretary to the General Manager and the Controller, Smith did not even work in the business office, and this case concerns the Observer's interviews of business office employees. Given the conflicting testimony in the record about whether particular assurances were given, Smith's testimony does not warrant overturning the Board's determination that Gregway testified credibly that she received no assurances that her participation was voluntary and that she

would not be punished for her responses.

We find no reason to overturn the Board's credibility determinations or factual findings, and we defer to these findings in reviewing the Observer's petition.

B.  Section 7 Rights

The Observer next maintains that the Board erred in finding a Section 8(a)(1) violation because Heusel and Gorno did not ask Gregway about her union activities and did not implicate her Section 7 rights.  This argument is contrary to the law.

Under Section 8(a)(1) of the NLRA, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 29 U.S.C. § 158(a)(1).  Section 7 guarantees employees the "right of self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining . . . ."  29 U.S.C. § 157.  The Supreme Court has held that Section 7 includes the "right of employees to discuss organization among themselves."  *Central Hardware Co. v. NLRB*, 407 U.S. 539, 542 (1972).  The right of employees to self-organize "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the job site." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491 (1978); *see Oakwood Hosp. v. NLRB*, 983 F.2d 698, 701 (6th Cir. 1993).  Because the Board found that the business office employees were "still talking" about unionization as of August 2001, they were exercising rights protected under Section 7.

C. The Totality-of-the-Circumstances T est

The Observer further contends that insufficient evidence supports the Board's finding that Heusel and Gorno unlawfully interrogated Gregway in violation of Section 8(a)(1).  We find that substantial evidence from the record as a whole supports the Board's findings that Gregway's interrogation violated Section 8(a)(1) under the totality-of-the-circumstances test.

"An employer violates section 8(a)(1) of the Act by coercively interrogating its employees about their union activities." *NLRB v. E.I. DuPont de Nemours*, 750 F.2d 524, 527 (6th Cir. 1984). To determine if an employer's interrogation is coercive, the Board applies a totality-of-the-circumstances test: "'whether under all of the circumstances the interrogation reasonably tends to restrain, coerce or interfere with rights guaranteed by the Act.'" *Dayton Typographic Serv., Inc. v. NLRB*, 778 F.2d 1188, 1194-95 (1985) (quoting *Rossmore House*, 269 N.L.R.B. No. 198, 116 L.R.R.M. 1025, 1026 (1984), *enforced sub nom. Hotel Employees & Rest. Employees Union, Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985)). When words or context suggest an "element of coercion or interference," an interrogation becomes unlawful. *E.g., ITT Auto. v. NLRB*, 188 F.3d 375, 389 (6th Cir. 1999) (internal quotation marks omitted).

The Observer argues that the Board erred in finding a violation of Section 8(a)(1) without evidence of actual coercion or an intent to coerce. The Observer is mistaken. The totality-of-the-circumstances test is an objective test, considering neither an employer's subjective intent nor an employee's subjective perception of the question. *E.g., Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 906 (6th Cir. 1997) (rejecting an employee's "subjective reactions" to statements in deciding whether the statements are unlawful); *see also Surprenant Mfg. Co. v. NLRB*, 341 F.2d 756, 763 (6th Cir. 1965). Instead of considering the subjective perceptions of an employer or employee, the Board analyzes whether the employer's questions reasonably had a tendency to coerce the employee's exercise of her Section 7 rights. *See Peabody Coal Co. v. NLRB*, 725 F.2d 357, 363 (6th Cir. 1984). Under all of the circumstances, if an employer's questions have a tendency to interfere with or coerce an employee's protected activity, then the employer's interrogation is unlawful under Section 8(a)(1).

When determining the coercive tendency of an interrogation, the Board considers several factors, including (1) the employer's prior hostility to unionization; (2) the questioner's identity

within the employer's organization; (3) the nature of the information sought; and (4) the place and methods of interrogation. *E.g., Architectural Glass & Metal Co. v. NLRB*, 107 F.3d 426, 434 (6th Cir. 1997); *Dayton Typographic Serv., Inc.*, 778 F.2d at 1194. Because substantial evidence from the record as a whole supports the Board's finding that Heusel's and Gorno's questions had a tendency to coerce Gregway in the exercise of her Section 7 rights, the Observer's arguments fail. *See V&S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 280 (6th Cir. 1999); *see also Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996).

### 1. Prior Hostility

The record shows that the Observer exhibited prior hostility toward the collective efforts of business office employees. Prior hostility to union activities suggests that the employer intended to coerce the employee. *See Architectural Glass & Metal Co.*, 107 F.3d at 434. The record is replete with examples of Observer's hostility toward the 1997 union campaign. For example, the Observer conducted meetings with employees to discourage unionization, mailed letters to each employee in the business office, and circulated an internal memorandum urging that the Observer terminate Podrasky. Even though the Observer's hostility to the 1997 union campaign occurred years before Gregway's interview, it constituted the Observer's most recent response to unionization efforts among the business office employees.

### 2. Questioner's Identity

Heusel's and Gorno's positions within the Observer further support the Board's determination that their questioning had a tendency to coerce Gregway. Gorno was a high-level company official, and Heusel was a company agent. As the Observer's attorney, Heusel represented the company in the Podrasky and Egnatowski lawsuit, which concerned the unsuccessful 1997 union campaign. Gorno's attendance during the interview further supports the Board's finding that the interrogation had a tendency to coerce Gregway. As the Human Resources Director, Gorno

participated in firing decisions of business office employees. The Board has recognized that the presence of management, such as Gorno, suggests coercion. *See Automotive Warehouse Distrib., Inc.*, 171 N.L.R.B. 683 (1968).

### 3. Nature of Information Sought

During the interview, Heusel and Gorno broached the subject matter of the employees' current union activities, and they asked Gregway three times whether the employees were still discussing the union. We examine whether the Observer's questions sought "information outside the issues raised in the complaint" by asking an employee a question that "potentially covers matters outside the scope of a complaint." *Dayton Typographic Serv., Inc.*, 778 F.2d at 1195.

The Observer maintains that Heusel's and Gorno's questions were permissible as discovery for the pending state-court lawsuit. *See* Mich. Ct. R. 2.302(B)(1). However, for material to be discoverable, it must be relevant to the subject matters of the pending suit. *E.g., Bauroth v. Hammoud*, 632 N.W.2d 496, 500 (Mich. 2001). In Michigan, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Mich. R. Evid. 401; *see also* FED. R. EVID. 401 (same). Evidence is relevant when the "fact to be proven [is] truly in issue." *People v. Crawford*, 582 N.W.2d 785, 792 (Mich. 1998). When the question has no probative value in resolving a contested issue, the evidence sought is irrelevant. *E.g., United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985); *see also People v. Edwards*, No. 213336, 2000 Mich. App. LEXIS 616, at **6-7 (Mich. Ct. App. June 9, 2000); *In re Estate of Johnson*, 328 N.W.2d 359, 360 (Mich. Ct. App. 1982) (holding that a report dated after the "relevant time period" was immaterial to the case).

The Observer cannot establish relevance. Although the Michigan rules have a broad scope of discovery, irrelevant information is not discoverable. Heusel's and Gorno's questions concerned

employees' current union activities, and they were not probative of contested issues in the pending suit. Their questions were wholly irrelevant. *See Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988) (observing that the proffered evidence could not "logically or reasonably be tied to the decision to terminate" the plaintiff). The Observer had no legitimate purpose in asking such questions of Gregway. Given the irrelevance of questions about current union support to the state-court case, the questions could easily be found to have a tendency to coerce Gregway not to exercise her Section 7 rights.

The Observer claims that Heusel and Gorno did not violate Section 8(a)(1) because neither asked Gregway about her own union sentiment. Contrary to the Observer's argument, an employer violates Section 8(a)(1) when it asks an employee about other employees' union sentiments. *See, e.g., Sundance Constr. Mgmt.*, 325 N.L.R.B. 1013, 1013 (1998); *Williamhouse of Cal. Inc.*, 317 N.L.R.B. 699, 716 (1995); *Cumberland Farms Inc.*, 307 N.L.R.B. 1479, 1479 (1992), *enforced*, 984 F.2d 556 (1st Cir. 1993). Heusel impermissibly asked Gregway why employees wanted a union.

### 4. Place and Methods of Interrogation

The context of the interrogation further supports the Board's finding that the Observer unlawfully interrogated Gregway. As to this factor, we recognize the Board's special expertise in determining the "impact of utterances made in the employer-employee relationship." *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969).

The Board found that Gregway was a reluctant participant in the interview and had not been an open union supporter. When Gorno called Gregway into her office to schedule the interview, Gregway asked Gorno, "[D]o I have to really do this?" Rather than informing Gregway that her participation was voluntary, Gorno answered, "It's really no big deal." Heusel and Gorno interviewed Gregway in a conference room.

The Observer contends that the Board erred because Heusel's and Gorno's interview did not

-14-

rise to the level of coercion. However, this argument fails because the existence of coercion in an interrogation is a factual issue entitled to deference. *See V&S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 279-80 (6th Cir. 1999) (affirming the Board's decision that the employer violated Section 8(a)(1) and rejecting the employer's argument that the question did not rise to the level of coercive interrogation); *see also Cumberland Farms, Inc. v. NLRB*, 984 F.2d 556, 559 (1st Cir. 1993). We have stated that "the Board's assessment of coercive effect, if reasonable, should be sustained." *NLRB v. Price's Pic-Pac Supermarkets, Inc.*, 707 F.2d 236, 239 (6th Cir. 1983) (internal citations omitted). Based upon all of the circumstances of the interview, substantial evidence supports the Board's conclusion that the interrogation had a tendency to interfere with Gregway's protected activity.

For the above reasons, we hold that substantial evidence supports the Board's finding that the Observer's interrogation of Gregway violated Section 8(a)(1).

D. *Johnnie's Poultry* Test

The Observer argues that the *Johnnie's Poultry* requirements do not apply to this case. In finding a violation of Section 8(a)(1), the Board did not reach the question of whether *Johnnie's Poultry* applied because the Observer's interrogation was unlawful under the totality-of-the-circumstances test. Because we find a violation of Section 8(a)(1) under the totality-of-the-circumstances test, it is also unnecessary for us to decide whether the *Johnnie's Poultry* assurances were required. *See In re EPI Constr.*, 336 N.L.R.B. 234, 241 (2001) (finding a violation under the totality-of-the-circumstances test and not determining whether the *Johnnie's Poultry* assurances applied). Even assuming that the Observer was correct in claiming that it was not required to provide the *Johnnie's Poultry* assurances, the Observer's interrogation violated Section 8(a)(1) because it was coercive under the totality-of-the-circumstances test. Accordingly, we affirm the Board's finding that the Observer's interrogation of Gregway violated Section 8(a)(1) of the NLRA.

IV. CONCLUSION

For the foregoing reasons, we conclude that substantial evidence supports the Board's ruling. This Court therefore **AFFIRMS** the decision of the National Labor Relations Board. The Observer's petition for review is **DENIED**, and the Board's cross-petition for enforcement is **GRANTED**.